IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-00007-RBJ

ASHLEY M. PACE (KLINEBRIEL),

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

This matter is before the Court on review of the Commissioner's decision denying claimant Ashley M. Pace's application for Disability Insurance Benefits under Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses and remands the Commissioner's decision.

### I.    **Standard of Review.**

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F. Supp. 2d 1280, 1287 (D. Colo. 1998). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.

1

1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Evidence is not substantial if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Regarding the application of law, "reversal may be appropriate when the [Social Security Administration] Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards."  *Springer v. Astrue*, No. 11-cv-02606, 2013 WL 491923, at *5 (D. Colo. Feb. 7, 2013).

## II.   Background.

Ms. Pace was born in 1983 and is now 33 years old.  *See* R. 162.  She joined the U.S. Navy in 2005 and served in active duty through 2008, after which she served in the Navy Reserve until 2011.  R. 41–42.

Ms. Pace began to develop several medical conditions during her military service.  R. 42. She experienced trauma while serving in the Navy, triggering depression, anxiety, and posttraumatic stress disorder (PTSD).  R. 327.  She suffers from frequent diarrhea and has several bowel movements per day—including occasional "accidents"—which were eventually diagnosed as symptoms of lymphocytic colitis and irritable bowel syndrome.  *See* R. 68, 721, 1007, 1016.  At the time of her hearing, Ms. Pace's treatment involved periodic intravenous drug infusion in a hospital over the course of several hours.  R. 52, 1007.  Additionally, she has recurrent uveitis, an inflammatory eye condition that blurs her vision.  R. 49, 375, 432.  She has also been diagnosed with fibromyalgia.  *See* R. 363.

After being honorably discharged from the Navy, Ms. Paced worked as an office manager for the Department of Veterans Affairs' Everett Vet Center.  R. 43–44.  She took

college classes during this time without earning a degree.  R. 31, 196.  In January 2013, however,

Ms. Pace suffered a mental breakdown at work.  R. 48.  She took leave from her job, but ended

up not returning after her anxiety symptoms persisted and her gastrointestinal problems and eye

disorder flared up.  *Id.*  She has not worked since then.  R. 181.

### A.  Procedural History.

On December 6, 2013 Ms. Pace applied for Disability Insurance Benefits, alleging

disability beginning January 21, 2013.  R. 162, 192.  The claim was initially denied on April 22,

2014.  R. 65–76.  Ms. Pace requested reconsideration, and her claim was denied again on

October 23, 2014.  R. 77–92, 97.  She then requested a hearing, which was held in front of

Administrative Law Judge (ALJ) Kathryn D. Burgchardt on July 16, 2015.  R. 24.  The ALJ

issued a decision denying benefits on July 24, 2015.  R. 11.  The Appeals Council denied Ms.

Pace's request for review on November 9, 2015, rendering the ALJ's determination the final

decision of the Commissioner for purposes of judicial review.  R. 1.  Ms. Pace filed a timely

appeal in this Court.

### B.  The ALJ's Decision.

The ALJ issued an unfavorable decision after evaluating the evidence according to the

Social Security Administration's standard five-step process.  R. 16–23.  First, she found that Ms.

Pace had not engaged in substantial gainful activity since her alleged onset date of January 21,

2013.  R. 16.  At step two, the ALJ found that Ms. Pace had the severe impairments of uveitis,

lymphocytic colitis, major depressive disorder, and posttraumatic stress disorder.  R. 16.  At step

three, the ALJ concluded that Ms. Pace did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 17.

The ALJ then found that Ms. Pace retained the residual functional capacity (RFC) to perform a range of unskilled light work with the following restrictions: lifting or carrying at most 10 pounds frequently and 20 pounds occasionally; performing pulling and pushing motions with the same weight restrictions; standing or walking up to a total of four hours and sitting up to a total of six hours, with normal breaks, in an eight-hour workday; avoiding unprotected heights, moving machinery, vibration, and concentrated noise; working only in a "relatively clean" environment (i.e., with low levels of pollutants and stable temperatures); only occasionally balancing, stooping, crouching, kneeling, crawling, or climbing; at most frequently ascending ramps or stairs, reaching overhead bilaterally, or using fine vision; having "reasonable" restroom access; not working in close proximity to coworkers or supervisors; and having only minimal contact with the public.  R. 18.

At step four, the ALJ concluded that Ms. Pace is unable to perform any past relevant work.  R. 22.  Finally, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Ms. Pace could perform.  R. 22.  Therefore, the ALJ concluded that Ms. Pace was not disabled.  R. 23.

### III.   Discussion.

Ms. Pace contends that the ALJ made five errors in the RFC determination.  Specifically, Ms. Pace argues that the ALJ improperly: (1) rejected the opinions of three of Ms. Pace's mental health providers; (2) relied on the opinions of nonexamining State agency psychological consultants; (3) mischaracterized evidence of Ms. Pace's daily activities; (4) inadequately

assessed Ms. Pace's limitations due to her irritable bowel syndrome; and (5) failed to address

Ms. Pace's migraines.  The Court will discuss each argument in turn.

### A.  Ms. Augustine's, Ms. Akers', and Ms. Sorden's Opinions.

The ALJ gave "little weight" to the Mental Impairment Questionnaires filled out by Ms.

Augustine, Ms. Akers, and Ms. Sorden.  R. 21, 909–25.  Ms. Pace takes issue with the ALJ's

evaluation of these medical opinions, claiming that the ALJ misapplied the relevant legal

standards.

### 1.  *Watkins* factors.

Ms. Pace first argues that the ALJ erred by failing to weigh these three opinions using the

factors provided in 20 C.F.R. § 404.1527(c) and analyzed in *Watkins v. Barnhart*, 350 F.3d 1297

(10th Cir. 2003).  The regulation requires an ALJ to consider:

- The examining relationship between the individual and the "acceptable medical source";
- The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
- The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
- How consistent the medical opinion is with the record as a whole;
- Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
- Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion.

Social Security Ruling (SSR) 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).

But Ms. Pace's argument is not quite right.  The ALJ is required to consider these factors

only in assessing "medical opinions."  20 C.F.R. § 404.1527(c).  "Medical opinions are

statements from . . . acceptable medical sources."  *Id.* § 404.1527(a)(2).  "Acceptable medical

sources" include licensed physicians and psychologists, but do not cover many medical sources like nurse practitioners or therapists.  SSR 06-03p, 2006 WL 2329939, at *1–2.  Ms. Augustine is a nurse practitioner while Ms. Akers and Ms. Sorden are therapists, so they do not qualify as "acceptable medical sources" who can give "medical opinions."  *See* R. 810, 836, 913, 925.

Social Security Ruling 06-03p clarifies that ALJs should still consider all opinions from medical sources who are not "acceptable medical sources" and that, at the ALJ's discretion, the aforementioned factors can be applied to these opinions.  SSR 06-03p, 2006 WL 2329939, at *4, 6.  The Ruling then summarizes the minimum relevant factors for considering such opinion evidence as follows:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s);
- Any other factors that tend to support or refute the opinion.

*Id.* at *4–5.  Thus, although these two lists are substantially similar, Ms. Pace was mistaken in arguing that the precise factors enumerated for an ALJ's consideration of acceptable medical sources' opinions—and the case law interpreting those factors—necessarily apply to Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions.  *See* 20 C.F.R. § 404.1527(c); *Watkins*, 350 F.3d at 1300.

Even though Ms. Pace advanced the wrong set of factors for evaluating the three medical sources' opinions, she is correct that the ALJ's decision did not display adequate consideration of the factors that do apply here.  "Not every factor for weighing opinion evidence will apply in

every case." SSR 06-03p, 2006 WL 2329939, at *5.  However, "the record must reflect that the

ALJ considered every factor in the weight calculation." *Andersen v. Astrue*, 319 F. App'x 712,

718 (10th Cir. 2009) (emphasis omitted) (unpublished) (citing *Oldham v. Astrue*, 509 F.3d 1254,

1258 (10th Cir. 2007)).  The ALJ's terse decision does not meet this requirement.

Specifically, the ALJ's discussion fails to show that she considered some of the

particularly potent aspects of Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions.  For

example, each of these sources has seen Ms. Pace multiple times.  *See* R. 909, 915, 925.  Ms.

Akers provided counseling services for Ms. Pace every one or two weeks over the course of

three years.  R. 915.  Her treatment notes comprise 33 pages in the record.  R. 779–810.  Ms.

Augustine reviewed claimant's extensive medical record before her initial visit in November

2014.  R. 863.  All of these providers are mental health specialists.  R. 804, 868, 925.

These omissions are significant because a proper assessment could find that the three

medical sources' opinions outweigh the State agency psychological consultants' views, which

the ALJ relied on in finding that Ms. Pace was not disabled.  *See* R. 20.  As Social Security

Ruling 06-03p explains:

> [A]n opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.  For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-03p, 2006 WL 2329939, at *5.  The State agency psychological consultants here are

neither examining nor treating sources, so it may be even easier for their views to be overcome

by opinions from medical sources who are not "acceptable medical sources."  *See Allison v.*

*Heckler*, 711 F.2d 145, 147–48 (10th Cir. 1983) ("The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal citations and quotation marks omitted).

On remand, the ALJ's discussion of the weight afforded to Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions should make clear that she considered the following factors:

- How long the source has known and how frequently the source has seen the individual; . . .
- The degree to which the source presents relevant evidence to support an opinion; . . . [and]
- Whether the source has a specialty or area of expertise related to the individual's impairment(s) . . . .

SSR 06-03p, 2006 WL 2329939, at *4–5.[1]

### 2. Explanation for giving these opinions little weight.

Besides failing to consider all of the relevant factors, the ALJ misapplied the factors that she did consider.

The ALJ offered two reasons for giving little weight to the opinions of Ms. Augustine, Ms. Akers, and Ms. Sorden.  First, the ALJ noted that these sources' Mental Impairment Questionnaires were mere checkbox forms without citations to objective evidence.  R. 21.

But this characterization is inaccurate.  Although these forms primarily consist of checkboxes and yes-or-no questions, they also include several questions that call for open-ended handwritten responses.  *See* R. 909–13.  Some of these responses do refer to objective evidence in the record.  For example, Ms. Akers cited the results of specific psychological tests, writing of the clinical findings that supported her opinion: "Results of several measurements re PTSD

---

[1] Of course, "[t]he regulations contemplate a briefer explanation if the decision is fully favorable and the opinion in question is of marginal importance to that decision."  *Andersen v. Astrue*, 319 F. App'x 712, 719 n.3 (10th Cir. 2009) (citing SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

severity: Mississippi Scale, Penn Inventory, & PCL-M all revealed high level of severity." R. 916; *see also* R. 807.  Similarly, Ms. Augustine wrote: "Ashley has numerous physical issues causing increase[d] depression, anxiety, difficulty concentrating, [and] feeling overwhelmed," and "Ashley has severe [gastrointestinal] issues which make[] it difficult to tolerate many psychotropic meds." R. 910; *see also* R. 832–36, 851–55; 863–68.  Even if these were simple checkbox forms, however, their opinions may not be dismissed on format grounds because they are based on extensive contact and examination history and "there were other materials that could lend support to the conclusions in the forms." *Andersen v. Astrue*, 319 F. App'x 712, 723–24 (10th Cir. 2009) (unpublished).

Moreover, the ALJ's reasoning would undercut the State agency psychologists' assessments—which were also on standard forms and offered little explanation—yet she gave their opinions significant weight. *See* R. 20, 72–74, 88–90.  To restate what this Court has said elsewhere: "It is difficult to understand how the ALJ could accept the nonexamining [psychologists'] unsupported restrictions on a checked blocks form when [she] was not willing to accept the same from [medical sources] who had a long history of treatment of [claimant]." *Naranjo v. Astrue*, No. 08-CV-02289, 2010 WL 1277974, at *6 (D. Colo. Mar. 30, 2010).  The ALJ's critique of the three medical source opinions' format is therefore not a valid basis for affording them little weight.

Second, the ALJ discounted Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions because she believed "the evidence as a whole" showed that Ms. Pace can perform work "that is not in close proximity to coworkers or supervisors and that involves minimal to no direct contact with the public." R. 21.

As an initial matter, the ALJ's finding does not call into question the three medical sources' opinions. Ms. Augustine and Ms. Akers noted that claimant has moderate difficulties in maintaining social functioning, while Ms. Sorden indicated that she has marked or greater difficulties. R. 913, 919, 925. These providers also opined that they expect claimant's social difficulties to interfere with her ability to interact appropriately with coworkers 5% to 15% of the time, with supervisors at least 15% of the time, and with the general public 5% to 10% of the time. R. 912, 918, 924. The ALJ's restricting claimant to work that is not in close proximity to coworkers or supervisors and that involves minimal contact with the public thus appears to be consistent with Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions.

Likewise, this evidence has no bearing on the other limitations that the three medical sources identified. For example, Ms. Augustine checked the highest level of restriction for claimant's ability to "perform at a consistent pace without an unreasonable number and length of breaks," "[r]espond appropriately to changes in a routine work setting," "[t]ravel in unfamiliar place[s]," and "[u]se public transportation." R. 912. She also indicated that claimant has marked or greater "[d]eficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." R. 913. Ms. Akers noted the highest level of limitation for claimant's abilities to "[m]aintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms." R. 917. Similarly, Ms. Sorden checked the most extreme restrictions for claimant's ability to "[m]aintain attention and concentration for extended periods," "[p]erform activities within a schedule, maintain regular attendance and be punctual within customary tolerances," "complete a normal workday and workweek without interruptions from psychologically based symptoms," and

"perform at a consistent pace without an unreasonable number and length of breaks." R. 923–24.

She also checked the boxes for marked or greater "[d]ifficulties in maintaining social

functioning" and "[d]eficiencies of concentration, persistence or pace resulting in failure to

complete tasks in a timely manner." R. 925. The ALJ's evaluation ignores all of this.

Turning to the specific evidence at issue, the ALJ justifies giving the three mental health

providers' opinions little weight by citing two parts of the record for the view that "claimant has

had [a] good response to mental health treatment." R. 21. First, the ALJ points out that

claimant's Global Assessment of Functioning (GAF) scores have increased from a low of 41 in

February 2013 to scores ranging from 52 to 65, which indicate largely moderate symptoms. *Id.*

(citing R. 308, 759, 779, 784, 789, 799, 801, 802, 804, 867).

However, the ALJ ignores the contexts for these GAF scores, rendering her conclusions

illusory. Ms. Akers conducted the bulk of the GAF assessments in claimant's file. *See* R. 779–

810. Her twenty-eight GAF assessments between July 2011 and April 2014 ranged only from a

score of 60 at claimant's intake to a low of 54 before plateauing at 60 again, indicating stability

over time rather than meaningful improvement. *See id.*; *see also Keyes-Zachary v. Astrue*, 695

F.3d 1156, 1162 n.1 (10th Cir. 2012) (defining all GAF scores between 51 and 60 as indicating

"[m]oderate symptoms"). Notably, the low of 54 was assigned just one day before Dr. Campbell

completed a thorough PTSD assessment that assigned Ms. Pace a GAF score of 41. *See* R. 308,

806. Instead of showing serious symptoms before a dramatic recovery, this near-simultaneous

thirteen-point differential suggests that Ms. Akers' consistently moderate GAF scores might have

been too high, since Dr. Campbell is an acceptable medical source and "acceptable medical

sources are the most qualified health care professionals." SSR 06-03p, 2006 WL 2329939, at *5.

11

Additionally, Ms. Akers offered her opinion in February 2015 based on her three-year treatment relationship with Ms. Pace, including her assignment of GAF scores. R. 919. These GAF scores do not undercut her opinion about the severity of Ms. Pace's symptoms because "the GAF score is not linked to any particular symptoms at all." *Harper v. Colvin*, 528 F. App'x 887, 891 (10th Cir. 2013).

The remaining GAF scores in claimant's file were assessed by Ms. Augustine and Mr. Cruse, a nurse. Ms. Augustine assigned a GAF score of 52 in November 2014, which likewise informed her Mental Impairment Questionnaire. *See* R. 867. Just six weeks prior, however, Mr. Cruse assigned a score of 65, the highest score on record and a mysterious thirteen-point jump from Ms. Augustine's assessment—possibly a short-lived recovery, or possibly another inconsistent result from a different score assessor reviewing the same symptoms. *See* R. 759.

None of this is to say that the ALJ could not choose to treat different examiners' GAF scores alike. After all, this Court's limited scope of review precludes it from reweighing the evidence or substituting its judgment for that of the Commissioner. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1500 (10th Cir. 1992). But the ALJ's decision shows no awareness of this evidence challenging the view that Ms. Pace has responded well to treatment, ignores the scores preceding Ms. Pace's low point that suggest her mental health has alternately gotten worse and better during treatment, and overlooks the fact that the medical sources in question based their opinions in part on some of these GAF scores. This is unacceptable. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

The second basis for the ALJ's concluding that Ms. Pace responded well to treatment was her unremarkable mental status exams during doctors' appointments.  R. 21.  According to the ALJ, Ms. Pace's mental health improvement was reflected in consistent reports that "claimant is alert and oriented x3, has good eye contact, is cooperative, has normal mood and affect, has no anxiety, has normal speech, has normal judgment and insight, has intact memory, and has normal range of gross cognitive functioning."  R. 21 (citing R. 505, 511, 627, 653, 670, 720, 758–59, 903, 1038).  This claim turns the RFC assessment into a farce.

Once again, the ALJ cannot rationally conclude that Ms. Pace's mental health symptoms have improved by citing stable data points.  "[G]enerally normal findings" could indicate that treatment has staved off more serious symptoms, but without more it is just as likely to show that her symptoms have persisted despite treatment.  *See* R. 21.

Similarly, the ALJ again errs by citing evidence that is irrelevant to the bulk of the limitations that Ms. Augustine, Ms. Akers, and Ms. Sorden identified.  *See supra*.  For example, Ms. Pace's alertness, eye contact, speech patterns, and so on do not contradict these sources' opinions that she cannot perform work at a consistent pace, maintain attention for extended periods of time, or stick to a normal workday and workweek routine.  *See* R. 912–25.  And there is no obvious connection between Ms. Pace's mental health issues responding to treatment (a relative measure) and her RFC being severely limited (an absolute measure)—especially since the three medical sources' gave their opinions in February and March 2015, after the alleged recovery took place.  *See* R. 909–25.

But there is more.  A close look at the record actually suggests that Ms. Pace's symptoms have gotten *worse*, not better.  The first two medical reports that the ALJ cites indicate normal

neurological and psychiatric results, but the third mental status exam observed that Ms. Pace's "[m]ood was dysthymic and anxious." *See* R. 505, 628, 903. This examiner, Dr. Terry, noted that her "symptoms of PTSD and depression have AT LEAST AS LIKELY AS NOT worsened since the date of her last exam" a year before. R. 632. The next few examinations produced normal results, but a subsequent November 2014 exam—which the ALJ fails to mention—found Ms. Pace to be anxious. *See* R. 511, 653, 670, 720, 758–59, 866. In the subsequent (and last) report on file, Dr. Flack wrote: "[Ms. Pace] presented with a depressed mood and sad affect, tearful many times throughout the interview." R. 1033.

Furthermore, the ALJ's discussion reveals a transparently selective reading of the record. For example, she cites Dr. Terry's review of claimant's PTSD disability benefits questionnaire for the finding that claimant "appeared oriented," but the very next page indicates that her "[m]ood was dysthymic and anxious." *See* R. 21, 627–28. Similarly, the ALJ cites Dr. Flack's finding that claimant had intact memory, but the doctor also observed that her mood was "depressed" and her affect was "sad." *See* R. 21, 1038. The ALJ may not pick and choose evidence from medical records in this manner. *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Clifton*, 79 F.3d at 1010.

This picking and choosing is especially troubling since the two sources the ALJ misrepresents are examining psychologists, while every mental status exam that found normal results was conducted by a nurse or a doctor who lacks mental health expertise. *See* R. 505 (emergency medicine doctor), 511 (same), 653 (rheumatologist), 670 (ophthalmologist), 720 (gastroenterologist), 759 (nurse), 903 (same); *cf.* SSR 06-03p, 2006 WL 2329939, at *4

(providing factors to consider in evaluating opinion evidence, including: "Whether the source has a specialty or area of expertise related to the individual's impairment(s)").

Therefore, on remand the ALJ should reevaluate whether Ms. Augustine's, Ms. Akers', and Ms. Sorden's opinions are adequately supported and are consistent with the record.[2]

### B. Nonexamining State Agency Consultants.

Ms. Pace's second argument is that the ALJ improperly relied on the opinions of the two State agency psychological consultants, Dr. Comrie and Dr. Frommelt. Neither psychologist has ever evaluated or examined Ms. Pace. Instead, Dr. Comrie based his mental RFC assessment on his review of the record through March 2014. *See* R. 67, 74, 287–495. Dr. Frommelt issued his assessment after reviewing Dr. Comrie's opinion and the record through October 2014. R. 79–82, 90, 287–777.

Ms. Pace is right again. These nonexamining psychologists' opinions must be evaluated using the aforementioned factors in 20 C.F.R. § 404.1527. As discussed above, "[a]lthough the ALJ's decision need not include an *explicit discussion* of each factor, the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen*, 319 F. App'x at 718. However, the only factor that the ALJ appears to have considered is the fact that the psychologists "are familiar with applicable definitions and evidentiary standards." *See* R. 20. This is always true of State agency consultants, but the Commissioner is not supposed to unthinkingly defer to them in every case. Other factors that are relevant here include:

---

[2] An attentive reader will notice that I have written about ten pages dissecting one page of the ALJ's RFC assessment. This is part of the problem. The ALJ's decision is inappropriately brief in light of the complexity of claimant's medical issues and lengthy record on file. I recognize that ALJs are often overburdened and cannot give all cases the consideration they may deserve, but excessively terse decisions just create more work for everyone involved when these cases are (understandably) appealed. For future reference, most Social Security decisions that this Court reviews are at least twice as long as the ALJ's ten-page decision here.

- The examining relationship between the individual and the "acceptable medical source";
- The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
- The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings; [and]
- How consistent the medical opinion is with the record as a whole . . . .

SSR 06-03p, 2006 WL 2329939, at *3.

Properly considered, each of these factors might undercut Dr. Comrie's and Dr. Frommelt's opinions and refute the ALJ's nondisability finding. For example, more than 300 pages of medical records were submitted after the psychologists issued their opinions. *See* R. 778–1091. These records include Ms. Akers' therapy treatment notes from 2011 through 2014 and the VA's mental health assessments in 2014 and 2015. *See id.* Yet the ALJ does not indicate whether the State agency psychological consultants' opinions are consistent with this new evidence, not to mention previously submitted evidence. *See* R. 20.

The ALJ should make clear that she considered all relevant factors in weighing Dr. Comrie's and Dr. Frommelt's opinions on remand.

## C.  Activities of Daily Living.

Next, Ms. Pace claims that the ALJ mischaracterized her activities of daily living in evaluating her credibility. The ALJ wrote that Ms. Pace "is quite active" despite her allegation of disability, and listed several activities that the ALJ believed reflected this activity level. R. 21. The Commissioner defends the ALJ's actions as a normal credibility assessment applying 20 C.F.R. § 404.1529 and *Wilson v. Astrue*, 602 F.3d 1136 (10th Cir. 2010).

16

But the Commissioner misrepresents the applicable law.  "[A]n ALJ's credibility determination must be 'closely and affirmatively linked' to substantial record evidence." *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (quoting *Hardman v. Barnhart*, 362 F.3d 676, 678–79 (10th Cir. 2004)).  To this end, the regulation instructs an ALJ to consider a claimant's daily activities in evaluating her *symptoms*, not her overall allegation of disability.  20 C.F.R. § 404.1529(c)(3)(i).  The *Wilson* court did just that, approving of an ALJ's view that a claimant's activities, such as gardening, undermined her assertions of specific disabling symptoms that are incompatible with those activities, in that case "severe pain in her back and neck." *Wilson*, 602 F.3d at 1146.

The ALJ here did not tie any of Ms. Pace's daily activities to her claims of disabling symptoms.  Recall that the ALJ found Ms. Pace's severe impairments to include uveitis, lymphocytic colitis, major depressive disorder, and posttraumatic stress disorder.  R. 16. Symptoms from these conditions include trouble seeing, chronic diarrhea, depression, and anxiety.  *See* R. 47–49.

It boggles the mind to imagine how some of the activities cited by the ALJ could possibly call into question Ms. Pace's alleged symptoms.  For instance, the ALJ wrote: "[Ms. Pace] spends time with her animals, including two horses, two chickens, three dogs and two goats."  R. 21.  So what?  Ms. Pace does not claim that she is bedridden.  There is no reason to think that this minimal activity is incompatible with her precise physical and mental disorders.  But the ALJ doubled down: "[Ms. Pace] brushes, cares for and feeds and waters her animals, with help from her husband."  *Id.*  I cannot guess what the ALJ was thinking; Ms. Pace's hobby sounds therapeutic for someone with mental health difficulties, not part of a "quite active" lifestyle.  The

same could be said of Ms. Pace's plans to take a class and join a rock and mineral club with her husband, since her therapist noted that this would be a good diversion for her increased anxiety. *See* R. 1019.

Some of the other activities cited could plausibly cast doubt on Ms. Pace's symptoms, but only because the ALJ distorts Ms. Pace's testimony to fit the narrative of a nondisability finding. Ms. Pace did not testify that she "attends church"; she said: "We try to make it to church but it doesn't happen very often . . . . Once every two or three months." R. 21, 38. She also did not say that she freely "goes out to dinner monthly with friends"; she said: "Sometimes we'll meet one of our friends for dinner. . . . Maybe once a month, *try to.*" *Id.* (emphasis added). Worst of all, the ALJ references Ms. Pace's April 2015 trip to Washington for her brother-in-law's wedding as if this contradicts her medical record, but she said of this trip: "It was embarrassing . . . . My anxiety was high; I had pain and I had accidents." R. 1007. She also reported to her therapist that she "has not traveled long distance for a while, and does not want to feel like a burden as she is more dependent now." R. 1019. If anything, these activities support Ms. Pace's claims about the severity of her limitations.

On remand, the ALJ's credibility assessment should be "closely and affirmatively linked" to substantial evidence in the record by connecting any discussion of Ms. Pace's daily activities to her symptoms. This assessment should also discuss the evidence supporting Ms. Pace's claims of a limited lifestyle that the ALJ overlooked. *See* R. 208–209, 211–12, 236–37.

### D.  Irritable Bowel Syndrome.

Ms. Pace next argues that the ALJ failed to address all of the limitations caused by her irritable bowel syndrome, which is closely tied to her lymphocytic colitis. Once again, I agree.

The ALJ found that Ms. Pace requires ready access to a restroom, but concluded that she needs only "normal breaks."  R. 18.  Ms. Pace asks the obvious question: "Why would [she] require ready access to a restroom, but not need more than 'normal breaks'?"  ECF No. 14 at 22.  The ALJ offers no explanation.

Moreover, the conclusion that Ms. Pace needs "normal breaks" is not supported by substantial evidence.  The record is rife with reports that she has to use the restroom more often and for more time than a normal person.  *See, e.g.*, R. 46 ("I . . . have multiple bowel movements in the morning. . . .  They're very painful, sometimes they're [sic] vomiting with them . . . ."), R. 201 ("I constantly have to be by a bathroom. . . .  [I]t is very embarrassing when you are at families [sic] house for the holidays and you are vomiting and can[not] control your bowel movements.  Going to the bathroom so many times in a day your butt hurts so bad you can[']t hardly sit."), R. 208 ("Have to be close to one [a toilet], it is painful."), R. 212 ("I have to go to the bathroom a lot and fear losing control of bowels.  I don't go out until afternoon because morning[s] are my worst."), R. 236 ("I wake up and go to the bathroom numerous times."), R. 602 ("Still having 5-6 bowel movements, abdominal pain present. . . .  Had one accident."), R. 901 ("[S]he reports six to 10 loose bowel movements per day . . . ."), R. 1007 ("I have had 5 stools already today [by 1:45pm].").

The Commissioner's defense of the ALJ's conclusion is inadequate.  *See* ECF No. 15 at 13.  Although it is true that Ms. Pace reported her bowel issues were manageable in August 2014 and the examining nurse suspected that her lymphocytic colitis was resolved, subsequent medical records reveal that her ailment returned.  *See* R. 721, 901, 1007, 1015–20, 1024.  Regardless, the ALJ did not mention this August 2014 examination, and the Court cannot accept the

Commissioner's post hoc rationalization. *See Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007).

The ALJ's failure to account for Ms. Pace's disorder in the frequency and duration of her bathroom breaks undermines the conclusion that she is not disabled. As the vocational expert explained, requiring three or four unscheduled breaks per day of five to ten minutes each would eliminate at least some of the jobs that the expert found Ms. Pace could perform. R. 62–63. Four breaks per day of ten to fifteen minutes each "would eliminate all competitive employment." R. 63.

The ALJ's RFC assessment should address Ms. Pace's actual need for bathroom breaks. If necessary, the ALJ should develop the record to determine exactly how often and for how long Ms. Pace needs these unscheduled breaks. *See Musgrave v. Sullivan*, 966 F.2d 1371, 1375 (10th Cir. 1992). The ALJ should then include Ms. Pace's bathroom break requirements in the hypothetical inquiry she poses to a vocational expert to support her step-five determination. *See Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) ("[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.") (quoting *Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990)).

### E.  Migraines.

Last, Ms. Pace claims that the ALJ failed to address her migraines. For the fifth time, I agree. Ms. Pace testified about her migraines at the hearing, and the ALJ interrupted to ask Ms. Pace's attorney where she could find these medical records. R. 53–54. As the attorney explained, the record contains numerous references to Ms. Pace's migraines. *See, e.g.*, R. 295,

361, 534, 563, 572–74, 578, 638, 720, 852.  Yet the ALJ's decision does not mention Ms. Pace's migraines at all.  *See* R. 14–23.  This is an error.

In determining a claimant's RFC, an ALJ must "consider the limiting effects of all [of a claimant's] impairment(s), even those that are not severe."  20 C.F.R. § 404.1545(e).  Failing to discuss an impairment—including determining whether the impairment is severe at step two—thus clouds an RFC determination at step four.  *See Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009) (unpublished).

The Commissioner responds that Ms. Pace did not establish that her migraines constituted a medically determinable severe impairment.  ECF No. 15 at 9.  This argument fails for several reasons.  First, the ALJ was required to consider the effects of Ms. Pace's migraines even if they were not severe.  *See* 20 C.F.R. § 404.1545(e).  Second, contrary to the Commissioner's assertions, the record does not unequivocally "show[] that [Ms. Pace's] reported headaches were related to her bouts of uveitis and were alleviated with eye drops or pain medication."  ECF No. 15 at 9–10.  Two of the medical records that the Commissioner cites involve times when Ms. Pace reported a headache without symptoms of uveitis.  *See* R. 295, 298.  And Ms. Pace's treatment notes explained her condition as follows:

> Headache, consistent with migraine.  Certainly overlap with symptoms of iritis (pain behind eye, photosensitivity) and overlap with chronic GI symptoms (nausea); however, prominent symptoms today of unilateral [headache] associated with nausea and photo/sonophobia in young woman also consistent with migraine.  Given that iritis and colitis already being treated, will treat for migraine today.

R. 574.  Finally, the ALJ altogether failed to mention Ms. Pace's migraines, and that is reason enough to reject the Commissioner's post hoc explanation.  *See Haga*, 482 F.3d at 1207–08.

On remand, the ALJ should consider at step two whether Ms. Pace's migraines alone or in combination with her other impairments are "severe." The ALJ should then address Ms. Pace's migraines in the RFC assessment. Depending on the ALJ's evaluation of the evidence for Ms. Pace's migraines, the ALJ may need to develop the record to determine their impact and include such limitations in the hypothetical questions posed to a vocational expert to support a step-five determination. *See Musgrave*, 966 F.2d at 1375; *Hargis*, 945 F.2d at 1492.

## CONCLUSION

Ms. Pace has identified five errors in the ALJ's decision that must be remedied before she can be denied Disability Insurance Benefits. I have essentially agreed with all of them. Still, the choice of whether to remand a case or directly award benefits is a matter of the Court's discretion. *See Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006). I won't at this time rule out the possibility that the ALJ could "do it right" and still deny benefits, although that strikes me as fairly unlikely given what I have reviewed to date.

## ORDER

For the reasons described above, the Court REVERSES and REMANDS the Commissioner's decision denying claimant Ashley M. Pace's application for Disability Insurance Benefits.

DATED this 21st day of December, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge